## Case No. 11,384.

### PRENTISS v. BARTON.

[1 Brock. 389.] 1

Circuit Court, D. Virginia.　Nov. Term, 1819.

CITIZEN—WHAT CONSTITUTES—COURTS—FEDERAL JURISDICTION.

Question of jurisdiction. What constitutes citizenship in another state, in the sense of the constitution and judicial act, with reference to the jurisdiction of the federal courts.

[Cited in Sharon v. Hill, 26 Fed. 342, 343.]

The original bill in this case was filed by the plaintiff, Christopher Prentiss, trustee of William Prentiss, alleging himself to be a citizen of Maryland, in November, 1806, and the answer of the defendant, a citizen of Virginia, in June, 1808. In the progress of the suit, Seth Barton, the defendant, died, and the suit was revived against his executors. In December, 1816, the executors filed an amended answer, in which the question of jurisdiction is raised. They deny that the plaintiff was then, or at the time of suing out the original writ, or at the times of exhibiting the original or amended bills, a citizen of Maryland, but insisted that he was, and had so continued from the institution of the suit, a citizen, either of the District of Columbia, or the state of Virginia, and called for strict proof of his citizenship. To this plea to the jurisdiction, the plaintiff replied generally. The state of facts to show or disprove the residence of the plaintiff in the state of Virginia, or District of Columbia, as developed by the depositions exhibited on the trial of the issue, together with the legal inferences from those facts, are presented and commented on in the following opinion.

MARSHALL, Circuit Justice. The jurisdiction of the court in this case depends on the citizenship of the plaintiff. If he was a citizen of the District of Columbia,2, or of the commonwealth of Virginia, this suit cannot be maintained; if he was a citizen of any other state, he may sue in this court.

Before I proceed to examine the facts in this case, I will consider the principle which must govern it.

The constitution of the United States gives the courts of the Union jurisdiction over controversies arising "between citizens of different states" (article 3, § 2), and the judicial act [of 1789 (1 Stat. 73)] gives this court jurisdiction, "where the suit is between a citizen of the state where the suit is brought, and a citizen of another state." The constitution, as well as the law, clearly contemplates a distinction between citizens of different states; and although the 4th article declares, that "the citizens of each state, shall be entitled to all privileges, and immunities of citizens in the several states," yet they cannot be, in the sense of the judicial article, or of the judicial act, citizens of the several states. There is still a distinction between them, if in no other respect, in their right to sue in the courts of the Union. This distinction, although it may be clear enough in theory, cannot always be easily drawn in fact. In a government, composed like ours, of distinct governments, and containing the principle which has been stated, it cannot depend entirely on birth. A citizen living in a state, with all the privileges and immunities of a citizen of that state, ought to share its burdens also, and will be considered, to every purpose, as a citizen. Accordingly, the universal understanding and practice of America is, that a citizen of the United States, residing permanently in any state, is a citizen of that state. Otherwise, a citizen by statute could never belong to any state, and could never maintain a suit in the courts of the United States. In the sense of the constitution and of the judicial act, he who is incorporated into the body of the state,

---

1 [Reported by John W. Brockenbrough, Esq.]

2 Hepburn v. Ellzey, 2 Cranch [6 U. S.] 445; 1 Pet. Cond. R. 444; Westcott v. Fairfield Tp. [Case No. 17,418]. In the case first cited, Hepburn and Dundas, citizens and residents of the District of Columbia (and so averring themselves in the pleadings), brought suit against Ellzey, a citizen of Virginia, who was averred to be such in the pleadings, in the circuit court of the United States, from the district of Virginia, and the court, being divided in opinion on the question of jurisdiction, certified that question to the supreme court. Held: That although the District of Columbia was a distinct political community, and constituted "a state" according to the definitions of writers on general law, yet that the act of congress, giving to the circuit courts, jurisdiction in cases between a citizen of the state in which the suit is brought, and a citizen of another state, used the term "state" in reference to that term, as used in the constitution; and that the term "state," in the sense of the constitution, applied only to the members of the American confederacy. Suit dismissed for want of jurisdiction. Neither can the United States courts entertain jurisdiction of a case between a citizen of a territory and a state. Corporation of New Orleans v. Winter, 1 Wheat. [14 U. S.] 91; 3 Pet. Cond. R. 499.

by permanent residence therein, so as to become a member of it, must be a citizen of that state, although born in another. Or, to use the phrase more familiar in the books, a citizen of the United States must be a citizen of that state, in which his domicil is placed. What is permanent residence? This question must, in some cases, depend on a great variety of considerations; and as in all mixed and doubtful questions of fact, each circumstance must be allowed its due weight. Birth alone, undoubtedly, gives a man permanent rights as a citizen; and although those rights, so far as respects suits in the courts of the United States, may be changed by a change of residence, yet, in doubtful cases, birth will always have great influence.

This question has never come directly, so far as I can discover, before the supreme court of the United States. The cases rather prove, that the jurisdiction of the court must be shown, than determine what constitutes citizenship. The first is that of Bingham v. Cabot, 3 Dall. [3 U. S.] 382, which was decided in 1798. The declaration was in the name of John Cabot of Beverly, in the district of Massachusetts, merchant, and in the name of other plaintiffs, described in the same manner. The court were clearly of opinion, that it was necessary to set forth the citizenship, or alienage, of the respective parties, in order to bring the case within the jurisdiction of the circuit court. In the argument, the attorney-general observed, "A citizen of one state, may reside for a term of years, in another state, of which he is not a citizen, for citizenship is clearly not co-extensive with inhabitancy." Mr. Dexter, in support of the jurisdiction, contended, that citizenship in a particular state, may be changed without going through the forms and solemnities, required in case of an alien; that, on the principles of the constitution, a citizen of the United States is to be considered, more particularly as a citizen of that state, in which he has his family, is a permanent inhabitant, and is, in short, domiciliated. This question came on again, in 1803, in the case of Abercrombie v. Dupuis, 1 Cranch [5 U. S.] 343. The suit was brought in the district of Georgia, and the plaintiffs averred, "that they do severally reside without the limits of the district of Georgia, aforesaid, viz.: in the state of Kentucky, therefore, they have a right to commence their said action," &c. The judgment was reversed on the authority of the case of Bingham v. Cabot. The question came on again, in 1804, in the case of Wood v. Wagnon, 2 Cranch [6 U. S.] 9, also from the district of Georgia. The declaration in that case, stated the plaintiff to be a citizen of Pennsylvania, and the defendant to be "of Georgia." The judgment in this case was also reversed. These cases all show, that the jurisdiction of the court must appear on the record; but the last shows,

that jurisdiction is not given, by averring a party to be of a particular state. The plaintiff was a citizen of Pennsylvania, and had, consequently, a right to sue either an alien or a citizen of Georgia, in the circuit court of Georgia. The defendant must have been, either an alien, or a citizen. If an alien, the court had jurisdiction. The judgment, then, must have been reversed, because the defendant might be "of Georgia," and yet a citizen of another state. This, certainly, does not prove what residence will constitute domicil, or citizenship; but I think it does prove, that it is not constituted by every residence.

By the general laws of the civilized world, the domicil of the parents at the time of birth, or what is termed the "domicil of origin," constitutes the domicil of an infant, and continues, until abandoned, or until the acquisition of a new domicil, in a different place. As it gives political rights, which are not lost by a mere change of domicil, it is recovered by any manifestation of a disposition to resume the native character; perhaps, by a surrender of a new domicil. In fact, it may be considered rather as suspended, than annihilated. All agree, that a new residence is not acquired, by a residence for temporary purposes. It must be a permanent residence. Vattel defines it to be, "a habitation, fixed in any place, with an intention of always staying there." [8] The existence of this intention, must be manifested by overt acts, in explanation of which, if doubtful, the declarations of the party will, undoubtedly, be received. Let this rule be applied to the case at bar. Christopher Prentiss was born in Massachusetts, of which state his parents were citizens, and there he received his education, and married a wife. He appears to have continued to reside in Massachusetts, until the year 1801, when he came to Georgetown, in the District of Columbia, and joined Mr. Rind, in editing a paper published in that place. In 1802, he sold his interest in that paper to Mr. Caldwell, and removed to Baltimore, with his family, where he continued for some time, as the editor of a paper. In 1803, he returned to Massachusetts, and leaving his wife with her father, went himself to England. After his return in 1804, he was frequently in the District of Columbia, where he was employed to take the debates of congress, for a printer in Philadelphia. I think, there is not much difficulty in determining, that Mr. Prentiss was not a cit-

[8] "The domicil is the habitation fixed in any place, with an intention of always staying there. A man does not, then, establish his domicil in any place, unless he makes sufficiently known his intention of fixing there, either tacitly, or by an express declaration. However, this declaration is no reason why, if he afterwards changes his mind, he may not remove his domicil elsewhere. In this sense, he who stops, even for a long time, in a place, for the management of his affairs, has only a simple habitation there, but has no domicil. Thus, the envoy of a foreign prince, has not his domicil at the court where he resides." Vatt. Law Nat. p. 109, § 218.

izen of the District of Columbia. If he acquired a domicil in that place in 1801, he certainly abandoned it in 1802, when he sold his property, and removed with his family to Baltimore. Whatever might have been his character, when residing in Baltimore with his family, he certainly recovered his original domicil, when he returned with his family to Massachusetts, and there is no ground to believe, that his afterwards residing in the District of Columbia, for the purpose of taking the debates, was an abandonment of it.

It remains to inquire, whether, at the emanation of this writ, he was a citizen of Virginia? It appears, that he came to Richmond, in March, 1805, and engaged, generally, with Mr. Davis, as the editor of his paper. On the 18th of July, he returned to Massachusetts, where he continued, until the latter end of September, when he came to Virginia, and resumed his employment with Mr. Davis. About the last of November, in the same year, he left Mr. Davis, finally, and has since been, occasionally, in Massachusetts, where his family resides, and, occasionally, in other states. I cannot think this residence in Richmond, was "a habitancy, with an intention of staying here always." It continued for only a few months, a considerable part of which was passed in his native state, and his employment was one, which he could abandon at any time. Had he acquired any property in the paper, the case would have been more doubtful, or had he remained in Richmond, till this time, or until this question occurred, his residence would have assumed the appearance of permanence. Plea to the jurisdiction overruled.

NOTE. The chief justice at the conclusion of the above opinion, referred to the case of The Nereide, 9 Cranch [13 U. S.] 388; 3 Pet. Cond. R. 439. That case was decided at February term, 1815, and the chief justice delivered the opinion of the court. Among other points resolved in that case, it was decided, that a merchant, being a native of, and having a fixed residence, in Buenos Ayres, where he carried on business, did not acquire a foreign commercial character, by occasional visits to a foreign country. The case of Prentiss v. Barton, above reported, strikingly resembles the case of Cooper v. Galbraith [Case No. 3,193], decided by Judge Washington, in 1819. That was an ejectment for land in the state of Pennsylvania, and the defendant was a citizen of that state. Cooper, the lessor of the plaintiff, was a naturalized citizen of Pennsylvania, and resided in that state, until the year 1816. In September, 1815, he resigned his professorship of chemistry, in the college of Carlisle, with an intention, as he declared, of removing to New Orleans, with a view of engaging in the practice of law. About the same time, he broke up his family establishment, disposed of his furniture, and remained with his family for some time, at the house of a friend, as a visitor. He afterwards relinquished his intention of going to New Orleans, and in the autumn of 1816, he removed with his family, to Camden in New Jersey (on the opposite side of the river to Philadelphia), where he rented a house for a year, and he continued to reside there, until November, 1817. In December, 1816, he was appointed a professor in the college of Philadelphia, where he delivered a course of lectures, coming over to Philadelphia every morning for that purpose, and returning to his family in the afternoon in Camden. It appears, from the report of the case, though that fact is not distinctly stated, that the ejectment was brought after Cooper's removal to New Jersey, and while he was in the active and daily discharge of his duties of professor in the city of Philadelphia. Judge Washington, in delivering his charge to the jury, said: "The question of jurisdiction is first to be considered. It is composed of law and fact; and as soon as the latter is ascertained, the question is relieved from every difficulty. Citizenship, when spoken of in the constitution, in reference to the jurisdiction of the courts of the U. S., means nothing more than residence. The citizens of each state, are entitled to all the privileges and immunities of citizens in the several states; but to give jurisdiction to the courts of the U. S., the suit must be between citizens residing in different states, or between a citizen and an alien. If a citizen of one state, should think proper to change his domicil, and to remove himself and family, if he have one, into another state, with a bona fide intention of abandoning his former place of residence, and to become an inhabitant, or resident of the state to which he removes, he becomes, immediately, upon such removal, accompanied with such intention, a resident citizen of that state, and may maintain an action in the circuit court (of the U. S.) of the state which he has abandoned, or in that of any other state, except the one in which he has settled himself." Having thus stated the principles of law, which must govern the case, the judge told the jury, that they would decide, whether, upon the evidence, the removal of the lessor of the plaintiff to New Jersey, was bona fide, and with intention to become a resident and inhabitant of that state. In Rabaud v. D'Wolf [Id. 11,519], it is said, that to deprive an American citizen of the right to sue in the circuit court of the U. S., on the ground of his not being a citizen of any particular state, there ought to be very strong evidence of his being a mere wanderer without a home. A verdict cannot be excepted to, on the ground of the insufficiency of the evidence to establish the citizenship of the plaintiff, as averred in the declaration, because the question of such citizenship, constitutes no part of the issue upon the merits, and must be brought forward by a proper plea in abatement, in an earlier stage of the cause. D'Wolf v. Rabaud, 1 Pet. [26 U. S.] 498.